OPINION
{¶ 1} Defendant-appellant, Bradley D. Jackson, appeals his conviction and sentence in the Butler County Court of Common Pleas on one count of complicity to aggravated robbery, and one count of complicity to murder. For the reasons outlined below, we reverse the trial court's decision as to sentencing only.
 {¶ 2} On March 27, 2002, the body of 33-year-old Paul Brown was discovered lying face down in Two Mile Creek behind an apartment complex in the city of Hamilton, Ohio. Brown had been stabbed 14 times and his throat had been deeply slit from ear to ear. Brown's wallet, his fishing license, his library card, and his Ohio driver's license were found separately some distance downstream, his front pants pockets had been turned out, and $7.07 was found in his rear pants pocket.
 {¶ 3} During the course of the investigation into Brown's murder, Hamilton Police Department detectives initially believed Richard Miller to be the primary suspect, and that appellant merely had information about Brown's death. However, detectives became aware of appellant's involvement in the murder after interviewing appellant and other individuals who knew Miller and appellant.
 {¶ 4} A complaint was filed in the Butler County Juvenile Court, alleging appellant to be delinquent for committing acts constituting complicity to aggravated robbery and complicity to murder. The juvenile court conducted a probable cause hearing, and pursuant to R.C. 2151.26
and Juv.R. 30, transferred the matter to the Butler County Court of Common Pleas so that appellant could be prosecuted as an adult. Subsequently, appellant was indicted on one count of complicity to aggravated robbery in violation of R.C. 2923.03(A)(2) and R.C.2911.01(A)(2), and complicity to murder in violation of R.C.2923.03(A)(2) and R.C. 2903.02(B). After a jury trial, appellant was convicted of both offenses, and the trial court sentenced appellant to serve an eight-year term of imprisonment for the complicity to aggravated robbery conviction, and an indefinite term of imprisonment from 15 years to life for the complicity to murder conviction, to be served consecutively. Appellant appeals his conviction and sentence, raising three assignments of error.
 {¶ 5} Assignment of Error No. 1:
 {¶ 6} "THE JURY FINDINGS OF GUILTY WERE AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE."
 {¶ 7} Appellant argues that the jury's verdict finding him guilty of both counts was against the manifest weight of the evidence. We disagree.
 {¶ 8} To determine whether a conviction is against the manifest weight of the evidence, an appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. When reviewing the evidence, an appellate court must be mindful that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 9} According to the record, at the time of Brown's death, appellant was a minor who was being treated as a patient in Sojourner Recovery Services ("Sojourner"), an inpatient drug treatment center located a few miles from where Brown's body was found. During the investigation, detectives interviewed appellant several times, beginning on June 25, 2003. At that time, appellant told detectives that he knew Rick Miller had committed robberies in the past, and that Miller had identified Brown as someone he wanted to rob and beat up. However, appellant said he had no personal knowledge that Miller had either robbed or killed Brown. At a subsequent interview on July 22, 2003, appellant told detectives that he did receive and use four passes to leave Sojourner while he was there, but that he did not use any around the time Brown was killed. During the July 22 interview, appellant again stated that he had no personal knowledge that Miller had been involved in Brown's murder.
 {¶ 10} On April 2, 2004, appellant admitted to detectives that in January or February of 2002, he escaped from Sojourner, and was caught and sent to a juvenile detention center two weeks later. Appellant also told detectives that in June of 2003, he had a conversation with Miller that consisted of the following:
 {¶ 11} "Rick said, man I did it. I don't know what I'm going to do. I asked Rick what he did and he said, the murder thing. I asked him if he had something to do with the murder and he said yeah. Then Rick asked, what are we going to do because people are catching on to me? I said we, what are you talking about we? After I asked that Rick started telling me what happened. Rick said he had a problem with the guy because the guy drugged his drink before. Rick said he saw him earlier in BW-3s and knew Paul had money. Rick said he saw the guy later and * * * followed the guy down Washington * * * and that he was going to beat his ass. * * * [Rick] mostly carries butterfly [knives] and he is good with them. Rick said he put latex gloves on his hands. Rick said he got into it with [Brown] and [Brown] got stabbed in the throat. They fought from the street back over to the creek, and [Brown] got stabbed some more. Rick was showing me with his hand how the guy was stabbed more than once. * * * When Rick was saying what happened he was not saying there were others with him. He never said we did this. He said either I or me did it [sic]. Rick never said anyone else was with him. Rick did not say he did anything to the body after that. I have heard a lot of rumors about things that happened but not from Rick." Appellant further stated, "I did not tell the police the truth before when asked. It has been pretty much eating me up inside that I withheld information about a murder. I was afraid to tell the police because I knew something about it. * * * I have a guilty conscience for not telling."
 {¶ 12} On April 7, 2004, after being advised of his Miranda rights, appellant stated the following:
 {¶ 13} "Det. Cifuentes picked me up at my girlfriend Tabitha's house and brought me to the police station. Lt. Martin read me my rights. I wanted to get the police off my back. I talked with Lt. Martin for a little bit then Lt. Scrimizzi and Det. Cifuentes took me into a room. Lt. Scrimizzi told me that he didn't believe me and that he thought I knew more than I was telling him. I told them that I had told them everything. Lt. Scrimizzi kept telling me that I needed to tell my side of the story. I started talking about what if I saw something but I wasn't involved. [sic] Lt. Scrimizzi told me that it all depended on what I had to say, [and] that I needed to tell the truth. I didn't know what to do because I was worried that the police wouldn't believe what happened. I didn't trust the police because of the things me and Rick do and then we get arrested. I didn't know how I could tell you and you not think that I was part of it. Lt. Scrimizzi said let me just ask you yes or no questions. Were you there when Paul Brown was killed and I told him yes. This is the complete truth, you have to believe this [sic]. The reason I have never told you this is because I was scared that you would not believe me. One night I think it was March 26th or 27th * * * [m]e and Rick Miller were walking down Brookwood Ave. We had already drank a 40 oz. and were looking for somebody to rob. We were talking about buying some cocaine if we got any money. * * * We were around the old Long John Silver's and we looked through the lot and saw a guy on Washington Blvd. walking toward McDonalds. Rick wanted to rob the guy. Rick said is that him * * * [l]ike Rick recognized the guy. We have [robbed] people in the past and have a way that we do it. Rick told me to stay here while [he went to] check it out. * * * Rick was going to rob the guy and I was looking out for the police. I was standing next to Arby's when Rick walked up behind the guy on the sidewalk just past Arby's. Rick hit the guy from behind with a forearm * * *. He knocked him down like on his knees then Paul was trying go get up and [held] his arm up to keep Rick off of him and Rick started pushing him several times towards the woods and I started walking towards them. I was about 20 feet away. I don't know if it was a full moon but there was a lot of light from the moon. Arby's was closed. * * * I saw Rick with a knife in his hand. It was a butterfly knife. * * * [H]e was holding it around Paul's shoulder and neck area. Rick was yelling empty your fucking pockets! We always were looking for cell phones and [jewelry and] anything of value. * * * I didn't see Rick stab him because I saw a police car coming down Brookwood Ave. I thought maybe they saw us. I yelled police and I hid against the building until the cop drove by and went down Brookwood. Then I ran across the street to the church lot and hid under a SUV for about 15 minutes. * * * I walked back across Washington towards the woods. I was calling for Rick but he didn't answer. I never went into the woods. I walked towards Thomas Blvd. There is a bridge there and I hid under the bridge to get high. It was the safest place in the area."
 {¶ 14} Appellant further stated: "I never saw Rick again until the graduation party at Danny Huff's house in Twinbrook. I didn't know that Paul Brown was killed until about a week later. I couldn't believe that Rick killed him and I wanted to block it all out of my mind. When I saw Rick at the graduation party we started talking. * * * I asked him what happened and he told me he stabbed him in the throat. He said that [Brown] was making a gurgling sound and that he was bleeding from his throat. I didn't get any blood on me because I wasn't close to them. He showed me how he was stabbing him. * * * I asked him how he got away with it * * *. He just told me that he had latex gloves on. I don't know if Rick got anything from Paul or not. I know that I never got anything. I am truly sorry that I didn't tell you the whole truth last week. * * * Everything that I told you [last week] was true except that I knew Rick was going to rob the guy and that I was there. * * * I know for a fact that the guy Rick robbed was Paul Brown * * *."
 {¶ 15} On April 19, 2004, appellant also made the following statement:
 {¶ 16} "* * * I am at the Hamilton Police Station talking to Lt. Scrimizzi and Det. Cifuentes. My Miranda rights have been read to me. I waived my rights and signed the waiver card. We have been discussing my time in Sojourner and whether or not I have ever snuck out or back in. We were also talking about passes I got while in there. We are talking about a time frame in March 2002, between Thursday 3/21 and Wednesday 3/27.
 {¶ 17} "I never snuck out by the fire escape because the alarm buzzes real loud. I went out the window three times. Once * * * I was gone for 2 weeks. I am pretty sure the other two times were during this time frame we are talking about. When I snuck out I had to sneak back in. I would throw a rock at the windows where the boys slept and somebody would open the door. I even helped someone sneak in.
 {¶ 18} "The night watch person during that time was mostly a guy named Vandy Gray. Vandy was pretty cool. When he did his hourly checks in our room he never made sure we were in bed. He would shine his flashlight around but would never pull back the covers. That is why we could sneak out. We just piled our pillows up to make it look like we were there. Vandy was working there the first time I left for two weeks. If Vandy did know we were gone he probably never would have said anything."
 {¶ 19} Appellant further stated:
 {¶ 20} "The night the thing happened with Paul Brown, I am pretty sure I was on an overnight pass. I am pretty sure it was on a Sunday night March 24th going into Monday morning March 25th. I snuck out [of] Mom's house on Franklin St. * * * I think it was between 11:00 p.m. and midnight when I snuck out. I was going to Scott James' house to get acid and ran into Rick Miller * * *. That is when Rick and I decided to rob someone so we could get cocaine.
 {¶ 21} "After Miller attacked the guy behind Arby's and I ran, I went back to my mom's house [instead] of Sojourner. That is why I think I was on a pass. If I was supposed to be in Sojourner then I would have had to sneak back in before morning so I wouldn't get caught * * *. I didn't' know if Rick Miller had been arrested or not. I also didn't know if Paul Brown was dead or not. I was scared of getting caught. * * * Around a month and a half later I learned * * * that the guy Rick and I were going to rob was Paul Brown and that he was dead. "I never told anyone that I was involved. * * * When I told the police last week [that] was the first time I ever told what happened."
 {¶ 22} In addition, Tabitha Staley, who was appellant's ex-girlfriend, testified at trial that appellant made several references to the incident. Staley testified that appellant had pointed at a location on Washington Blvd. and told her that a guy had been murdered there. Staley testified that later, during an argument, appellant told her that she "should just stay away from him * * * [because] he was going to jail for a long time * * * [for] murdering someone * * *." Staley also testified that on another occasion, while sitting in front of the former Long John Silver's restaurant on the same street, appellant pointed at the creek and told her that is where Paul Brown's body had been found.
 {¶ 23} Further, Staley testified that in another conversation, appellant told her that one night, "[he and Miller] followed [Brown] out of BW-3s, and when they were walking down Washington Boulevard, * * * [appellant] * * * jumped on top of him and was holding him down while Rick was beating him." Staley testified that later, appellant told her that "the reason why [Miller and appellant] had killed [Brown] was * * * [because] Paul Brown owed Rick Miller and Brad Jackson money for the cocaine." Staley continued, testifying that appellant said that he and Miller "were just going to rob him and take his money. And that's all that [appellant] knew was supposed to happen."
 {¶ 24} In addition, Larry Prentner, who was appellant's cellmate while they were at the Butler County Jail, testified that appellant told him that he and another person had followed an individual to a McDonald's and then to an apartment complex. Prentner further testified:
 {¶ 25} "* * * [Jackson] told me their intentions were to rob him and to beat him up. And when the individual supposedly came out of the apartment complex, * * * they started beating him up and picking at his pockets and kicking him, and said the individual fell several times, and [tried] getting up, [but] they kept assaulting him. And [appellant] said that [the individual] wouldn't stay down, and that he was fighting. * * * [Jackson also] said that he's never going to get out of prison."
 {¶ 26} Prentner also testified that appellant said "he did not stab * * * [the individual] as many times as Miller * * *." Prentner testified that appellant stated that after the attack, "* * * he went to his girlfriend's apartment and changed his clothes. He said that his clothes were bloody, and * * * that he took a shower."
 {¶ 27} Further, Robert Bailey, a former employee at Sojourner, testified that he worked during the weekend of March 23-25, 2002, and that he collected a urine sample from appellant for a drug screen on March 24, 2002 and on March 26, 2002, and that he only took such samples after a patient returned from being out of the facility on a pass. Bailey also testified that he knew of incidents where patients had snuck out of the facility and then back in, and that it was relatively easy to disarm the security system designed to prevent such an escape.
 {¶ 28} Appellant argues that the jury clearly lost its way in finding him guilty of the charged crimes, because there was no direct evidence implicating appellant in the crimes. Further, appellant maintains that many of the state's witnesses lacked credibility.
 {¶ 29} Although much of the evidence against appellant is circumstantial, circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can only be established by circumstantial evidence. State v. Jenks (1991),61 Ohio St.3d 259, 272. Moreover, a conviction based solely on circumstantial evidence is no less sound than one based on direct evidence. State v.Begley (Dec. 21, 1992), Butler App. No. CA92-05-076, 5.
 {¶ 30} Further, "an appellate court must bear in mind the trier of fact's superior, firsthand perspective in judging the demeanor and credibility of the witnesses. * * * An appellate court is ill suited to assess witness credibility, as the demeanor and attitude of witnesses do not translate well into the written record." (Citations omitted.) In reD.S., 160 Ohio App.3d 552, 2005-Ohio-1803, ¶ 14.
 {¶ 31} After reviewing the record, including the evidence described above, we find that there is ample evidence in the record, including appellant's own statements, that supports the jury's verdict. Further, we find that the jury did not clearly lose its way in finding appellant guilty of complicity to aggravated robbery and complicity to murder. This is not an exceptional case where the evidence weighs heavily against the conviction. Appellant's first assignment of error is overruled.
 {¶ 32} Assignment of Error No. 2:
 {¶ 33} "THE TRIAL COURT ERRED IN IMPOSING A PRISON TERM THAT EXCEEDED THE SHORTEST PRISON TERM AUTHORIZED FOR THE OFFENSE."
 {¶ 34} Assignment of Error No. 3:
 {¶ 35} "THE TRIAL COURT ERRED IN IMPOSING A CONSECUTIVE PRISON TERM."
 {¶ 36} In his second and third assignments of error, appellant argues the trial court erred by making findings that violate the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, when it imposed a nonminimum sentence for his complicity to aggravated robbery conviction, and ordered the sentences on both convictions to be served consecutively. We agree.
 {¶ 37} In Foster, the Court held that portions of Ohio's statutory sentencing scheme were unconstitutional. Id. at ¶ 1, 3, and 5 of the syllabus. Among the statutes found unconstitutional was R.C. 2929.14(B), governing the imposition of a nonminimum sentence and R.C. 2929.14(E) and R.C. 2929.41(A), governing the imposition of consecutive sentences. Id. at ¶ 1 and 3 of the syllabus. The Foster court severed these and other sections from the sentencing code and instructed that all cases pending on direct review in which the unconstitutional sentencing provisions were utilized must be remanded for resentencing. Id. at ¶ 104.
 {¶ 38} According to the record, the trial court found that pursuant to R.C. 2929.14(B), "the shortest prison term would demean the seriousness of [appellant's] conduct and the shortest prison term would not adequately protect the public from future crime by [appellant] * * *." Further, the court found that pursuant to R.C. 2929.14(E), " * * * consecutive sentences are necessary to protect the public or to punish [appellant], and [are] not disproportionate to the seriousness of [appellant's] conduct and the danger that [appellant] poses to the public, and [appellant's] history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by [appellant] * * *."
 {¶ 39} Because the trial court utilized R.C. 2929.14(B) in imposing a nonminimum prison term on appellant's complicity to aggravated robbery conviction, and utilized R.C. 2929.14(E) in ordering that appellant's sentences on both convictions be served consecutively, we must remand this case for resentencing consistent with Foster. Appellant's second and third assignments of error are sustained.
 {¶ 40} The judgment of the trial court is affirmed as to appellant's convictions, but reversed and remanded for resentencing as to appellant's nonminimum sentence on his complicity to aggravated robbery conviction, and as to consecutive sentencing.
POWELL, P.J., and WALSH, J., concur.